

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| DR. THOMAS ORR, | 1:19-CV-01023-CBK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| SOUTH DAKOTA BOARD OF REGENTS, DR. KELLY DUNCAN, FORMER NSU DEAN OF EDUCATION, IN HER INDIVIDUAL CAPACITY; MEMBERS OF THE SOUTH DAKOTA BOARD OF REGENTS, IN THEIR OFFICIAL CAPACITIES; AND DR. NEAL H. SCHNOOR, NSU PRESIDENT, IN HIS OFFICIAL CAPACITY; | |
| Defendants. | |

Plaintiff Dr. Thomas Orr contends that defendants Dr. Kelly Duncan, Dr. Neal H. Schnoor[1], the South Dakota Board of Regents, and the members of the Board of Regents violated various federal laws by interfering with his use of paternity leave and retaliating against him for several protected activities by refusing to give him tenure. This matter is before the Court on cross motions for summary judgment.

I.      **Background**

In 2011, Northern State University hired Dr. Thomas Orr as a tenure-track professor for the Health and Physical Education Department within the University's School of Education. Dr. Orr was responsible for teaching a variety of classes focusing on sports and wellness. In June 2015, the University hired Dr. Kelly Duncan to replace Dr. Constance Geier as Dean of the School of Education. Dr. Duncan had earlier been

---

[1] President Schnoor was substituted as a party after the previous Northern State University President, Dr. Timothy Downs, resigned. See Doc. 43.

the Secretary of the South Dakota Department of Education. When the University hired Dean Duncan, Dr. Orr was serving as the Department's "coordinator," a position with a heightened level of responsibility. Dr. Duncan was hired from outside the school despite Dr. Orr's contention that an internal candidate had much support from the search committee. Dr. Orr began to have issues and confrontations with Dean Duncan during her first semester that worsened over time. In May 2017, Dean Duncan hired Dr. Ross Flom to be "chairperson" of both the Health and Physical Education Department and the Counseling and Psychology Department, which were the two departments in the School of Education. The chair position replaced Dr. Orr's coordinator role. Dr. Orr did not receive this news well and immediately spoke with others about being relieved of his position and discussed applying for new jobs elsewhere.

Following Dean Duncan's decision to promote Dr. Flom, there were a series of meetings among Dr. Orr, Dean Duncan, and Susan Bostian, the University's Director of Human Resources. At the first meeting in June, Dean Duncan wanted to explain her decision to promote Dr. Flom in lieu of Dr. Orr. Dr. Orr believed that Dean Duncan was retaliating against him and made several general complaints about her management of the Department. He also complained about some of his other colleagues. Dr. Orr accused the Department of racially discriminating against Dr. Geumchang Hwang, a Korean professor whose contract was not renewed in the prior year. Dr. Orr had previously raised these concerns about racial discrimination allegedly directed at Dr. Hwang in an e-mail to Provost Alan LaFave, University General Counsel John Meyer, and then-President James Smith when the decision was made to not renew Dr. Hwang's contract. A few days after the June meeting, Dr. Orr sent a lengthy e-mail to President Timothy Downs, Provost Alan LaFave, and Ms. Bostian raising his complaints about the changes to the coordinator role and Dean Duncan generally. He requested reinstatement to his former position and suggested moving his program outside of the School of Education. In July, Dr. Orr e-mailed the same group to renew his concerns and specifically accuse Dean Duncan of racial discrimination towards Dr. Hwang. Dr. Orr, Provost LaFave, Dean Duncan, Ms. Bostian, and General Counsel Meyer met again in August, and Dr.

2

Orr raised the same complaints about Dean Duncan's management while Provost LaFave urged civility and collegiality. Provost LaFave gave great advice.

That fall, Dr. Orr applied for promotion and tenure. The tenure committee met on December 15, 2017, to review Dr. Orr's application along with several other faculty member's applications. The eight-member committee was comprised of Dean Duncan, Jon Schaff, Josh Hagen, Kenneth Boulton, Sara Christensen Blair, Timothy Mantz, John Peterson, and Constance Geier. Even a casual observer would know that Dean Duncan had various axes to grind and should have recused herself from the tenure committee with respect to Dr. Orr's application. A reasonable jury could find it outrageous that no one in administration, including legal counsel, even suggested that Dean Duncan should recuse. This is not due process of law. The first amended complaint rather "dances around" a claim of due process but I find the allegations are barely sufficient, at least at this point. The University evaluates its tenure decisions based on three different areas: teaching, service, and research. In his tenure application letter, Dr. Orr reviewed those categories and with respect to research stated that he was working on two textbooks. Five members, Ms. Blair, Mr. Mantz, Mr. Hagen, Mr. Boulton, and Dean Duncan voted against Dr. Orr's tenure application. Mr. Schaff abstained. Mr. Petersen and Dr. Geier voted in favor. The committee forwarded its recommendation against granting Dr. Orr's tenure application to President Downs on the same day.

Around the same time that Dr. Orr applied for tenure, his wife was pregnant with their child. On December 27, 2017, he emailed Ms. Bostian to inquire about the possibility of taking paternity leave. Ms. Bostian responded to Dr. Orr and explained the University's policy allowing him to use six weeks of paid sick leave while on paternity leave. She attached a standard letter that stated Dr. Orr's rights under the Family Medical Leave Act and the required forms for Dr. Orr to complete. The initial Leave Act form that Dr. Orr submitted on January 16, 2018, indicated that he intended on taking zero to thirty days of leave. Dr. Orr left for paternity leave on January 17, 2018, and returned to work around March 7, 2018.

3

After the tenure committee submitted its recommendation to President Downs, he conducted an evaluation of Dr. Orr's application where he reviewed Dr. Orr's tenure binder and accompanying materials. Based on that review, President Downs decided to deny Dr. Orr's application for tenure and so informed him on March 23, 2018. Dr. Orr initiated a grievance to appeal the denial. During the appeal process, President Downs inquired into the status of Dr. Orr's two textbooks and learned that one of the books was put on hold by the publisher due to a lack of progress. When President Downs met with Dr. Orr to discuss his tenure application appeal, President Downs asked Dr. Orr to show progress on his two books. Dr. Orr provided several chapters of one book that had a handful of minor edits from the prior edition and apparently admitted the other book was on an indefinite hold. Based on that showing, President Downs believed that Dr. Orr was deficient in research and informed him on April 30, 2018, of the reasons he was denied tenure. Dr. Orr was able to appeal administratively that decision again and received his final denial of tenure on October 22, 2018.

## II.    Standard of Review

Summary judgment is proper where there is no genuine issue as to any material fact the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; Bedford v. Doe, 880 F.3d 993, 996 (8th Cir. 2018). The United States Supreme Court has held that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (internal quotations omitted).

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4

(1986). That is, to make summary judgment inappropriate, there must be a factual dispute concerning facts the existence or nonexistence of which "must be outcome determinative under prevailing law." Walls v. Petrohawk Props., LP, 812 F.3d 621, 625 (8th Cir. 2015) (quoting Grey v. City of Oak Grove, 396 F.3d 1031, 1034 (8th Cir. 2005)).

Thus, in accordance with Rule 56(c), the party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Upon such a showing, the burden shifts to the non-movant to present affirmative evidence, beyond the pleadings, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256–57. To meet its burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmovant must be able to "show there is sufficient evidence to support a jury verdict in their favor." Nat'l Bank of Com. v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir. 1999). After this exercise, "we view the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party." Northport Health Servs. of Ark., LLC v. Posey, 930 F.3d 1027, 1030 (8th Cir. 2019). "To show a genuine dispute of material fact, a party must provide more than conjecture and speculation." Zayed v. Associated Bank, N.A., 913 F.3d 709, 720 (8th Cir. 2019).

### III.    Analysis

Dr. Orr's claims orbit his ability to use paternity leave after the birth of his child, statements that he allegedly made about Dean Duncan, the Department's treatment of a Korean faculty member, and the University's subsequent denial of his tenure application. He claims that the University violated the Family Medical Leave Act by interfering with and retaliating against his use of paternity leave, violated Title IX by discriminating against him on the basis of sex, violated 42 U.S.C. § 1981 by retaliating against him for opposing racial discrimination and harassment, and violated the First and Fourteenth Amendments of the United States Constitution by retaliating against him for statements made in his capacity as a citizen on matters of public concern.

At the outset, the Court must resolve a potential problem with two of Dr. Orr's claims. Pursuant to § 1983, Dr. Orr brings his § 1981 and First Amendment claims against the members of the South Dakota Board of Regents and President Schnoor in their official capacities. In Dr. Orr's amended complaint, he states that he "seeks only equitable and injunctive relief against the institutional defendants" with respect to his § 1983 claims. Of course, he cannot seek damages from the named institutional defendants. The South Dakota Board of Regents is an arm of the state that cannot be sued under § 1983 due to Eleventh Amendment immunity. See Prostrollo v. Univ. of S.D., 507 F.2d 775, 777 n.1 (8th Cir. 1974) ("[W]e think it is fundamental that the University of South Dakota and the corporate body constituting the Board of Regents, both political subdivisions of the state, may not be sued under the Civil Rights Act since neither entity constitutes a 'person' within the meaning of § 1983."); Aase v. S.D. Bd. of Regents, 400 N.W.2d 269, 271 (S.D. 1987) (holding "that the Board of Regents is not a person within the meaning of 42 U.S.C. § 1983 . . . and may not be sued under that section"); see also Keating v. Univ. of S.D., 980 F.Supp. 2d 1137, 1143 (D.S.D. 2013) ("[T]he Board of Regents is protected by the Eleventh Amendment from suits in federal court."), rev'd on other grounds, 569 Fed. Appx. 469 (8th Cir. 2014). An official capacity claim against an individual is actually a claim "against the governmental entity itself." White v. Jackson, 865 F.3d 1064, 1075 (8th Cir. 2017) (quoting Brockington v. City of Sherwood, 503 F.3d 667, 674 (8th Cir. 2007)). Therefore, the members of the Board of Regents, as officials of a state entity that is entitled to Eleventh Amendment immunity, are also entitled to Eleventh Amendment immunity. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The same reasoning applies to President Schnoor. Eleventh Amendment immunity is a jurisdictional threshold matter that can be raised at any time or by the Court. See Lors v. Dean, 746 F.3d 857, 861 (8th Cir. 2014). Here, to the extent that Dr. Orr's § 1981 and First Amendment retaliation claims are for damages brought against the members of the Board of Regents and President Schnoor in their official capacities, those claims are barred by Eleventh Amendment immunity and must be dismissed.

Dr. Orr's claims against the Board of Regents under the Family Medical Leave
Act and Title IX, however, are not barred by Eleventh Amendment immunity.  See
Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 740 (2003) (holding that Congress
abrogated Eleventh Amendment immunity for purposes of the Leave Act's family-leave
provisions); Fryberger v. Univ. of Ark., 889 F.3d 471, 477 (8th Cir. 2018) ("[42 U.S.C. §
2000d–7(a)(1)] expressly waives state sovereign immunity for violations of . . . title
IX . . . ." (quoting Sossamon v. Texas, 563 U.S. 277, 291 (2011))).

### a. Family Medical Leave Act

Dr. Orr claims that the University violated the Leave Act with respect to his use of
paternity leave. The Leave Act entitles an employee to 12 work weeks of leave during a
12-month period for a serious health condition. 29 U.S.C. § 2612(a)(1)(D). An
employee can allege two types of claims against his employer: "(1) 'interference' claims
where the employee alleges that the employer denied or interfered with her substantive
rights under the [Leave Act]; and (2) 'retaliation' claims where the employee alleges that
the employer discriminated against her for exercising her [Leave Act] rights." Brandt v.
City of Cedar Falls, 37 F.4th 470, 478 (8th Cir. 2022) (quoting Wierman v. Casey's Gen.
Stores, 638 F.3d 984, 999 (8th Cir. 2011)). Here, Dr. Orr alleges both. These two claims
are brought against the South Dakota Board of Regents.

### i. Interference

"An employer is prohibited from interfering with, restraining, or denying an
employee's exercise of or attempted exercise of any right contained in the [Leave Act]."
Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (quoting 29 U.S.C.
§ 2615(a)(1)). "Interference includes 'not only refusing to authorize FMLA leave, but
discouraging an employee from using such leave. It would also include manipulation by
a covered employer to avoid responsibilities under [the Leave Act].'" Id. (quoting 29
C.F.R. § 825.220(b)). To succeed on his interference claim, Dr. Orr must prove (1) he
was an eligible employee; (2) the University was an employer as defined by the Leave
Act; (3) he was entitled to Leave Act leave; (4) he gave the University notice of his intent
to take Leave Act leave; and (5) the University interfered with his Leave Act benefits to

7

which he was entitled.  See Brandt, 37 F.4th at 478.  Again, there need not be a denial. Interference is sufficient to constitute a violation.  The parties here do not contest that Dr. Orr was an eligible employee as defined by the Leave Act, that the University is an employer covered by the Leave Act, that Dr. Orr was entitled to Leave Act leave, or that Dr. Orr properly gave the University notice of his intent to take leave.[2]  The parties primarily dispute whether the University denied Dr. Orr Leave Act benefits to which he was entitled.

Dr. Orr's denial claim fails because he cannot show that he was denied benefits to which he was entitled.  To start, it is undisputed that Dr. Orr took approximately six weeks of leave under the Leave Act.  Dr. Orr stated during his deposition testimony that he took six weeks because the University's policy allowed him to use 30 days of paid sick leave, which translated to six work weeks.  He complained that he had "tons of sick time" that he "should have been able to use, in [his] opinion."  But the Leave Act "does not require employers to provide paid leave."  Chubb v. City of Omaha, 424 F.3d 831, 833 (8th Cir. 2005).  Dr. Orr argues that not allowing him to use the full balance of his sick leave to take twelve paid weeks under the Leave Act was against the University's policy and characterizes this apparent misinformation as interference.  But the Court "decline[s] to punish [the University] for putting [Dr. Orr] in a better position than he would have enjoyed had [the University] fulfilled only its minimum duties under the [Leave Act]."  Id.

Dr. Orr argues that certain university employees' comments made him feel like he could not use paternity leave and he was discouraged from taking the full 12 weeks of leave.  Notwithstanding his own statements already noted that directly contradict this

---

[2] The defendants state in a footnote in their responsive brief to the plaintiff's motion for summary judgment that Dr. Orr did not properly request leave under the Leave Act because he put in his request two days in advance.  In turn, Dr. Orr attempts to support his Leave Act claims by arguing that the University was required to inform him of his Leave Act rights when it was put on notice that Dr. Orr might need leave.  But the University did not deny Dr. Orr's leave for giving improper notice and he began his leave when he requested; thus, neither fact is relevant.

allegation, Dr. Orr can point to no evidence suggesting that he was denied the additional six weeks of leave. To succeed on a theory of interference under the Leave Act, the Eighth Circuit has held that "the employee must also show that the employer denied the employee entitlements under the [Leave Act]." Quinn v. St. Louis Cnty., 653 F.3d 745, 753 (8th Cir. 2011). Here, Dr. Orr cannot show evidence that the University ever denied him an additional six weeks of leave because he apparently never requested it. Therefore, the defendants' motion for summary judgment with respect to Dr. Orr's Leave Act interference claim should be granted. Dr. Orr was initially misinformed about the extent of leave but President Downs almost immediately corrected that.

### ii. Retaliation

Where a plaintiff does not present direct evidence of retaliation,[3] as is the case here, his retaliation claim is evaluated under the McDonnell Douglas burden-shifting framework. Chappell v. Bilco Co., 675 F.3d 1110, 1116–17 (8th Cir. 2012). Dr. Orr must first establish a prima facie case of retaliation by showing that he engaged in protected conduct, suffered a materially adverse employment action, and the materially adverse action was causally linked to the protected conduct. Id. If Dr. Orr establishes a prima facie case, the burden shifts to the University to "promulgate a non-discriminatory, legitimate justification for its conduct," and then back to Dr. Orr to "either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce

---

[3] Dr. Orr does not appear to rely on a direct evidence theory, nor could he. "Direct evidence provides a strong causal link between the alleged discriminatory bias and the adverse employment decision." Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc., 826 F.3d 1149, 1160 (8th Cir. 2016) (quoting McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861 (8th Cir. 2009)). "Direct evidence may be circumstantial if the inferred causal link is strong enough." Id. (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Griffith, 387 F.3d at 736 (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Id. Orr focuses his argument largely on the McDonnell Douglas indirect evidence standard.

9

additional evidence proving actual discrimination." Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001) (citations omitted).  The parties do not contest that Dr. Orr engaged in protected activity under the Leave Act by using paternity leave.

Dr. Orr can establish a prima facie case of retaliation.  The defendants first try to argue that Dr. Orr cannot establish a prima facie case because he had not taken paternity leave when the tenure committee cast its votes.  But this argument ignores that the final tenure decision happened when President Downs made his decision on either April 30 or October 22, 2018, by denying Dr. Orr's appeals.  There is no adverse employment decision until a tenure denial is final.  See Okruhlik v. Univ. of Ark., 395 F.3d 872, 880–81 (8th Cir. 2005).  By the time President Downs issued his final decision on Dr. Orr's tenure application, Dr. Orr had completed his paternity leave.

Although the defendants do not appear to contest causation for Dr. Orr's Leave Act retaliation claim, there is a question whether Dr. Orr can satisfy it for his prima facie retaliation case.  A plaintiff can rely on the temporal aspect between his protected conduct and the adverse employment action to show causation.  See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832–33 (8th Cir. 2002).  Here, Dr. Orr began his paternity leave on January 17 and returned to work around March 7 before President Downs denied his tenure on April 30, 2018, about fifteen weeks after Dr Orr began paternity leave and almost eight weeks after he returned from paternity leave.  Two weeks is "sufficient, but barely so" to establish a prima facie case of causation.  Id. at 833.  The eight weeks here is insufficient, standing alone, to show causation.  But the defendants do not contest the issue, and Dr. Orr has also alleged and shown evidence that President Downs was acutely aware that he was using paternity leave, even though President Downs, when informed of Dr. Orr's interest in using Leave Act leave, ensured that it was available for Dr. Orr to use in full.  That fact, along with the alleged controversy around Dr. Orr's use of paternity leave, may be sufficient to support "an inference of retaliatory motive" necessary to show causation for purposes of a prima facie

10

case. See Gibson v. Concrete Equip. Co., 960 F.3d 1057, 1065 (8th Cir. 2020 (quoting Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002)).

Assuming that Dr. Orr can make a prima facie case of retaliation, the defendants provide some evidence of a legitimate, nondiscriminatory reason for President Downs' decision to deny Dr. Orr's tenure.  President Downs testified that he denied Dr. Orr's tenure because Dr. Orr represented that he was working on a book but had actually made no progress on it and the publisher had put the project on an indefinite hold.  The University's burden to come forward with evidence of a legitimate, nondiscriminatory action "is not onerous and the showing need not be made by a preponderance of the evidence."  Phillips v. Mathews, 547 F.3d 905, 912 (8th Cir. 2008) (quoting Wallace v. Sparks Health Sys., 415 F.3d 853, 860 (8th Cir. 2005)).

Dr. Orr argues that this reason is pretextual for several reasons.  He states that he satisfied the University's standard for tenure, all comparable faculty were granted tenure in the past decade, the University shifted its research-based reason to problems involving Dr. Orr's collegiality, and he was well-liked by his colleagues.  Additionally, Dr. Orr argues pretext because Dean Duncan, Provost LaFave, and President Downs all exhibited animus towards his protected activity and that Dean Duncan "engaged in subterfuge" and "clandestine efforts to sabotage" Dr. Orr's tenure application by pressuring Dr. Flom to rescind his recommendation.[4]  An employee can show pretext in at least two ways.

---

[4] Throughout the briefs, the parties spar about the applicability of the "cat's paw" theory of liability that prevents an employer from being shielded from liability by using a purportedly independent decisionmaker to act as a conduit for a subordinate to effect unlawful discrimination.  See Qamhiyah v. Iowa State Univ. of Sci. and Tech., 566 F.3d 733, 742 (8th Cir. 2009).  The cat's paw rule relates primarily to the direct evidence standard of showing intentional employment discrimination rather than the indirect McDonnell Douglas framework.  See id. at 742–46 (discussing the cat's paw theory as it relates to the plaintiff's direct evidence argument); Diaz v. Tyson Fresh Meats, Inc., 643 F.3d 1149, 1152 (8th Cir. 2011) (noting the "doctrinal tension" between the cat's paw theory used in direct-evidence cases against its use in McDonnell Douglas burden-shifting cases).  When the Eighth Circuit has applied the cat's paw theory within the McDonnell Douglas burden-shifting framework, it is used to show pretext.  See Amini v. City of Minneapolis, 643 F.3d 1068, 1075 (8th Cir. 2011).

"First, a plaintiff may succeed 'indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006) (quoting Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). Using that method, "the employee must rebut the employer's 'underlying factual claims' by establishing that the employer's explanation has no basis in fact." Id. (quoting Wallace, 443 F.3d at 1120). "Second, the plaintiff may prove pretext 'directly by persuading the court that a [prohibited] reason more likely motivated the employer.'" Id. (quoting Wallace, 443 F.3d at 1120).

Dr. Orr cannot contest the factual basis for the University's proffered reason because the publisher of one of his books specifically stated that the project was on an indefinite hold due to lack of progress and Dr. Orr admitted as much. Thus, Dr. Orr must persuade the Court that the University was more likely motivated by a prohibited reason. First, we must remember that federal courts do not "sit as a super personnel council to review tenure decisions." Brousard-Norcross v. Augustana College Ass'n, 935 F.2d 974, 976 (8th Cir. 1991). On the other hand, I am not the finder of fact. To show pretext, "the plaintiff must show something more than a mere dispute over her qualifications for the position." Kobrin v. Univ. of Minn., 121 F.3d 408, 414 (8th Cir. 1997). "Indeed, in the tenure context, for example, the plaintiff's evidence of pretext must be of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported." Id. If the cat's paw theory does have a place within the McDonnell Douglas framework, then Dr. Orr has submitted sufficient evidence that Dean Duncan acted against him with discriminatory intent. Dr. Orr alleged that Dean Duncan was unhappy with his use of paternity leave and produced evidence showing that his use of paternity leave caused issues within the department. The University's shifting-reasons also suggest that the University's proffered reasoning is a pretext for discrimination. Various members of the tenure committee indicated that they were influenced by Dr. Orr's lack of collegiality, but the University later stated that its reasons for denying Dr. Orr's tenure were due to his substandard record of research. "[T]he court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine

12

whether there is a genuine issue for trial." <u>Stallings</u>, 447 F.3d at 1053 (quoting <u>Anderson</u>, 477 U.S. at 249). The record shows that Dr. Orr was the first male employee of the Department to take paternity leave. There are genuine issues of material fact as to whether the denial of tenure was unsupported as to Dr. Orr's Leave Act retaliation claim and summary judgment should be denied.

### b. Title IX

Dr. Orr's Title IX claim alleges that he was discriminated against on the basis of sex because of his commitment to his family and use of paternity leave. The defendants first urge the Court to reconsider its order on the defendants' motion to dismiss this claim on the basis that Title IX does not extend to employees of covered institutions. <u>See</u> Doc. 37. The Court declines to do so.

As stated in the Court's previous order on this topic, the Eighth Circuit has not specifically ruled on the question of whether an employee can bring a claim for sex discrimination under Title IX. To the extent that the Eighth Circuit has addressed the issue, it stated in a footnote, "Claims of discriminatory employment conditions are cognizable under Title IX." <u>O'Connor v. Peru State College</u>, 781 F.2d 632, 642 n.8 (8th Cir. 1986) (citing <u>North Haven Bd. of Educ. v. Bell</u>, 456 U.S. 512 (1982)). In <u>Brine v. University of Iowa</u>, the Eighth Circuit cited the <u>O'Connor</u> footnote and stated that a Title IX employment discrimination claim "merely duplicates" a Title VII claim, although in that case the university did not challenge the proposition that a private right of action existed for the associate professors who raised Title IX claims. 90 F.3d 271, 276 (8th Cir. 1996).

If those two binding Eighth Circuit opinions do not answer the question of whether an employee can raise a Title IX claim, the text of the Act does. Title IX states, "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Person" is a general term that should be given its general meaning, which includes employees of an educational program. In <u>North Haven Board of Education v. Bell</u>, the Supreme Court held that

13

employment discrimination fell within the prohibitions of Title IX. 456 U.S. at 535–36 ("Although we agree with the Second Circuit's conclusion that Title IX proscribes employment discrimination in federally funded education programs, [regulations under the Act must be program specific]."). The North Haven Court based its ruling in part on Title IX's broad statutory language, although it also included an analysis of the Act's legislative history because Title IX did not specifically include or exclude employees from its scope. Id. at 520–22. More than 20 years later in Jackson v. Birmingham Board of Education, the Supreme Court permitted a high school basketball coach, as a public employee, to raise a retaliation claim under Title IX based on the text of the Act that it found "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" 544 U.S 167, 173 (2005) (quoting 20 U.S.C. § 1681). Although Justice Thomas authored a dissenting opinion in Jackson joined by three other justices, his reasoning was unrelated to the plaintiff's status as an employee. Id. at 184–85 (Thomas, J., dissenting). His opinion was based on the alleged natural meaning of the phrase "on the basis of sex," which does not extend to retaliation, and the requirement that Congress speak clearly when imposing conditions upon the acceptance of federal funds. Id. Whereas other antidiscrimination statutes, such as Title VII and the ADA, specifically prohibited retaliation, Title IX does not. Id. at 189–90. Under that line of reasoning, it is difficult to reconcile the defendants' argument that Title IX does not encompass a private right of action for employees when the Supreme Court expressly held in North Haven that employees are persons covered by the Act.

If employees are covered as persons under Title IX, then they also have an implied private right of action. The Supreme Court first ruled in Cannon v. University of Chicago that Title IX contains an implied private right of action for a student to claim against a university. 441 U.S. 677, 717 (1979). It subsequently applied that private right of action in several different contexts. See Franklin v. Gwinnett County Pub. Schools, 503 U.S. 60, 76 (1992) (authorizing private parties to seek monetary damages for intentional violations of Title IX); Gebster v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290–91 (1998) (holding that the private right of action encompasses deliberate

14

indifference sex discrimination in the form of a teacher sexually harassing a student);
Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 642 (1999) (holding that the private
right of action against an educational institution extends to sexual harassment of a student
by another student). Based on that line of cases, an employee would also have an implied
private right of action against a university.

While there is a circuit split regarding this question, several of the circuits that
held Title IX does not encompass employees of covered institutions did so before the
Supreme Court decided Jackson. In so holding, the Fifth Circuit dismissed the
"jurisprudential arithmetic" that incorporated reasoning from Cannon, North Haven, and
Franklin because none of those cases required the Supreme Court to address the
relationship between Title VII and Title IX. Lakoski v. James, 66 F.3d 751, 753–54 (5th
Cir. 1995). Instead, the Fifth Circuit ruled that Title IX did not create a private right of
action for employment discrimination and that Title VII was the exclusive mechanism for
resolving employment disputes. The Seventh Circuit ruled that Title VII preempted
equitable relief under Title IX and decided that a Title IX gender discrimination claim
precludes the pursuit of a § 1983 claim based on the same set of facts—a ruling that was
eventually abrogated by the Supreme Court. See Waid v. Merrill Area Pub. Schs., 91
F.3d 857, 862 (7th Cir. 1996) (abrogated in part on other grounds by Fitzgerald v.
Barnstable Sch. Comm., 555 U.S. 246, 257–58 (2009)). On the other hand, the Third
Circuit held that an employee's retaliation claim can be pursued under both Titles VII and
IX based on "four guiding principles". Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545,
562 (3d Cir. 2017). First, "despite Title VII's 'range' and 'design as a comprehensive
solution' for 'invidious discrimination in employment,'" the Supreme Court ruled that
private sector employees are not limited to Title VII remedies. Id. (citing Johnson v. Ry.
Express Agency, 421 U.S. 454, 459 (1975)). Second, alternative avenues of relief for
employment discrimination that might circumvent Title VII are a matter of policy left for
Congress to decide. Id. Third, based on North Haven, the provision implying Title IX's
private cause of action encompasses employees, not just students. Id. Fourth, based on

15

Jackson, Title IX's private cause of action extends to employees who allege sex-based retaliation claims. Id.

Given the text of Title IX and relevant Supreme Court precedents, the Court agrees with the reasoning of the Third Circuit. The Supreme Court has repeatedly indicated the language of Title IX is expansive and has a broad application. See Jackson, 544 U.S. at 173 ("In [Cannon, Franklin, Gebser, and Davis], we relied on the text of Title IX, which, subject to a list of narrow exceptions not at issue here, broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.'" (quoting 20 U.S.C. § 1681)); Id. at 175 ("Courts must accord Title IX a sweep as broad as its language." (quoting North Haven, 456 U.S. at 521) (cleaned up)). To the extent that the phrase "no person" is limited in scope by later language in the statute: the Supreme Court foreclosed that argument in North Haven. Joined by Chief Justice Burger and Justice Rehnquist, Justice Powell argued in dissent that a natural reading of "any person" was limited to "those who are enrolled in, or who are denied the benefits of, programs or activities receiving federal funding." North Haven, 456 U.S. at 541 (Powell, J., dissenting). But the six-member majority decided otherwise. Justice Powell also argued that Congress would not have enacted the "carefully prescribed procedures" of Title VII if they were duplicated in Title IX for employees of covered instructions. Id. at 552. The majority dismissed those policy considerations as a matter for Congress to weigh. Id. at 535 n.26 (majority opinion). In the same footnote, the North Haven Court stated that it "repeatedly has recognized that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination." Id. Here, the Court decides to follow the weight of Supreme Court precedent and the plain meaning of the text of the statute that gives Title IX a broad application that includes employees of institutions receiving federal funds.

The parties disagree on what legal test should apply to Dr. Orr's Title IX sex discrimination claim. The defendants argue first that the Title IX deliberate indifference standard for sexual harassment applies to Dr. Orr's Title IX claim. Dr. Orr disagrees and argues that the standard for a sex-based employment discrimination claim applies but

16

cites to a case that discusses a § 1981 retaliation claim. Dr. Orr's complaint, however, alleges a Title IX sex discrimination claim, not a retaliation claim. In Brine, the Eighth Circuit stated the same standards apply to Title IX as would to Title VII. 90 F.3d at 276; see also Du Bois v. Bd. of Regents of Univ. of Minn., 987 F.3d 1199, 1203–04 (8th Cir. 2021) (applying Title VII standards to Title IX retaliation claim). To state a prima facie case of sex discrimination using the McDonnell Douglas burden-shifting framework, Dr. Orr must show that he: "(1) is a member of a protected class; (2) was meeting [his] employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of [his] protected class." Rebouche v. Deere & Co., 786 F.3d 1083, 1087 (8th Cir. 2015) (quoting Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013)). Like Dr. Orr's retaliation claims, once he establishes a prima facie case, the burden shifts to the University to show a legitimate, nondiscriminatory reason for its employment decision. Gibson v. Concrete Equip. Co., 960 F.3d 1057, 1062 (8th Cir. 2020). Dr. Orr must then show that the University's legitimate, nondiscriminatory reason is a pretext for intentional discrimination. Id.

Even if Dr. Orr can establish a prima facie case of discrimination, which the Court does not necessarily believe, the University has articulated a legitimate nondiscriminatory reason for denying Dr. Orr's tenure application. President Downs stated that the reason he denied Dr. Orr's tenure application was because he was deficient in the research category. Dr. Orr cannot show that reason is false because he admitted that one of his books was on indefinite hold with the publisher due to the lack of progress and demonstrated that he had made practically no progress on the second. The weight of Dr. Orr's several briefs focus on his qualifications for tenure—but validating or invalidating tenure decisions is not generally the role of a federal court. To the extent that Dr. Orr puts forth similarly situated comparators in an attempt to show pretext, for which he provides no legal argument, his assertion fails. Dr. Orr simply states, "All comparable faculty were granted tenure within the past decade." But "the test for whether someone is sufficiently similarly situated, as to be of use for comparison, is rigorous." Beasley v.

17

Warren Unilube, Inc., 933 F.3d 932, 938 (8th Cir. 2019) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (2014) (en banc)). "This is perhaps especially true in the tenure context where disparate treatment could be due to a host of reasons other than unlawful discrimination. Maras v. Curators of Univ. of Mo., 983 F.3d 1023, 1029 (8th Cir. 2020). "The plaintiff and the potential comparators must have 'dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.'" Beasley, 933 F.3d at 938 (quoting Johnson, 769 F.3d at 613). Dr. Orr has shown no such similarly situated employees. Because the University has given a legitimate nondiscriminatory reason for its decision to deny Dr. Orr's tenure application that he cannot show is a pretext, defendants' motion for summary judgment with respect to Dr. Orr's Title IX sex discrimination claim should be granted.

### c. First Amendment Retaliation

Dr. Orr's First Amendment claim alleges that he was retaliated against for speaking as a citizen on matters of public concern. Dr. Orr alleges that he made protected statements with regards to the University and Dean Duncan's discriminatory treatment of Dr. Hwang. Dr. Orr additionally alleges that he made protected statements accusing Dean Duncan of changing student grades and retaliating against another professor who she pressured to change a grade, as well as Dean Duncan's possible involvement in potential criminal activity as a participant in the Gear Up Scandal.[5] As already stated, Dr.

---

[5] The Gear Up program directed federal funding to states, including South Dakota, to help high-poverty middle and high school students prepare for college with a particular focus on Native Americans. After an administrator at one of the organizations receiving grant money shot and killed his wife and children before setting their home ablaze and turning the gun on himself, investigators discovered that the administrator was embezzling massive amounts of Gear Up funds. Several other grant administrators were later indicted on various charges. Dean Duncan, as a state official with the Department of Education, was tasked with evaluating and managing the program.

Dr. Orr's complaint also alleged in his complaint that he made other protected statements accusing Dean Duncan of giving preferential treatment to student athletes and bullying

Orr's First Amendment claims against the members of the Board of Regents and
President Schnoor in their official capacities, to the extent they claim damages, are barred
due to Eleventh Amendment sovereign immunity.  Dr. Orr did not bring his First
Amendment claim against former President Downs in his individual capacity.

Dean Duncan asserts that she is entitled to qualified immunity on the basis that she
did not violate any clearly established constitutional law.  The qualified immunity
analysis begins with a two-part inquiry to determine if a constitutional violation may
have taken place and if the right in question was clearly established at the time of the
violation.  See Henry v. Johnson, 950 F.3d 1005, 1010–11 (8th Cir. 2020) (quoting Nord
v. Walsh County, 757 F.3d 734, 738 (8th Cir. 2014)).  The First Amendment prohibits
government officials from subjecting an individual to retaliatory actions for engaging in
protected speech.  Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019).  "If an official takes
adverse action against someone based on that forbidden motive, and 'non-retaliatory
grounds are in fact insufficient to provoke the adverse consequences,' the injured person
may generally seek relief by bringing a First Amendment claim."  Id.  To first establish a
prima-facie case of unlawful retaliation for protected speech, Dr. Orr has to show the
same elements as for his Leave Act claim.  See Henry, 950 F.3d at 1011 (quoting
Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009)).  Dr. Orr
"must prove: (1) he engaged in activity protected by the First Amendment; (2) the
University took an adverse employment action against him; and (3) his protected speech
was a substantial or motivating factor in the University's decision to take the adverse
employment action."  Davenport, 553 F.3d at 1113.

The legal test is the same for Dr. Orr's First Amendment retaliation claim as it is
for his Leave Act retaliation claim, but the analysis is different because he did not bring a
claim against President Downs in his individual capacity.  Liability under the Leave Act
is attributed to the University, however, liability for constitutional torts under § 1983 is

---

other students, reporting false data to the University's accrediting organization, misusing
resources in the Department, and abusing her power as Dean of the School of Education.

attributed to a specific person. Although denial of tenure is an adverse employment decision, see Brousard-Norcross, 935 F.2d at 978, in this case, President Downs made the final decision, and Dean Duncan can only be held liable for her own personal actions. See Heartland Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805–06 (8th Cir. 2010) ("'Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.' Section 1983 does not sanction tort by association.") (quoting Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006))); Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) ("'Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' . . . Thus, 'each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'" (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676–77 (2009))). The cat's paw theory of liability does not necessarily fit particularly well within the § 1983 framework of personal liability, but it may. Dean Duncan voted against Dr. Orr's tenure in the committee meeting and Dr. Orr alleges that she influenced other members to do the same as well as influenced President Downs' decision to deny tenure, but Dean Duncan did not make that ultimate decision. Of course, that is the very nature of the cat's paw theory and the holder of the cat's paw by definition is not the final decisionmaker. Indeed, Eighth Circuit precedent "establishes that a single member of a governing board can be liable for voting in favor of an unconstitutional government action." Rinne v. Camden Cnty, 65 F.4th 378, 385 (8th Cir. 2023) (citing Strickland v. Inlow, 485 F.2d 186, 189 (8th Cir. 1973), vacated and remanded on other grounds sub nom. Wood v. Strickland, 420 U.S. 308 (1975)). A reasonable jury could well find that Dean Duncan had more than one axe to grind and used them to the damage of Dr. Orr. A defendant is entitled to qualified immunity only "if at the time of [her] actions the applicable law was not clearly established such that a reasonable officer could have known that [her] actions violated the constitutional rights of [Dr. Orr]." Shockency v. Ramsey Cnty, 493 F.3d 941, 950 (8th Cir. 2007).

20

Viewed through the lens of what Dean Duncan specifically or allegedly did, Dr. Orr may be able to show that her actions are sufficient to establish an adverse employment action. "The law defining adverse employment actions is fact intensive, and there are no clear guidelines between demotions, suspensions, or terminations at one end of the spectrum and conduct at the other end which is not actionable, such as general hostility." Id. Here, Dean Duncan made strong unfavorable comments about Dr. Orr during the tenure meeting before voting "anonymously" against Dr. Orr as one member of an eight-person committee. The "unlawfulness must be apparent" for the unconstitutionality of an action to be clearly established enough to overcome qualified immunity. Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Eighth Circuit precedent establishes that one member of a committee can be liable for an unconstitutional action, and cat's paw liability is an issue of fact to be decided by a jury, not by this Court. Based on the undisputed facts viewed in the light most favorable to Dr. Orr, the law was clearly established that Dean Duncan's acts were serious enough to amount to an adverse employment action.

Under Eighth Circuit precedent, the Court proceeds through a multi-step analysis to determine if Dr. Orr's speech is entitled to First Amendment protection. The Court first determines "whether the employee spoke as a citizen on a matter of public concern." Henry v. Johnson, 950 F.3d 1005, 1011 (8th Cir. 2020) (quoting Hemminghaus v. Missouri, 756 F.3d 1100, 1110 (8th Cir. 2014)). "If the answer is yes, then the possibility of a First Amendment claim arises." Id. Here, the defendants have failed to show as a matter of law that Dr. Orr's various statements were not made as a citizen on a matter of public concern. If an employee's statements are protected by the First Amendment, an employer can nevertheless argue that the speech had an adverse effect on the efficiency of its operations and that the Court should engage in a Pickering balancing test that considers the efficiency interests of the government employer against the employee's interest in his speech. See Henry, 950 F.3d at 1011. But the weight of the defendants' legal argument focuses on whether Dr. Orr's statements were made as a citizen on a matter of public concern and the defendants do not argue that his statements had an

21

adverse effect on the efficiency of its operations nor that its governmental interests outweigh Dr. Orr's interest in his speech based on the Pickering balancing test factors.[6] On that basis, Dean Duncan is not entitled to qualified immunity and the defendants' motion for summary judgment with respect to Dr. Orr's First Amendment retaliation claim should be denied.

Dr. Orr also brings a claim for reinstatement to his former teaching position against President Downs and the members of the South Dakota Board of Regents in their official capacities. A claim for equitable relief is not barred by Eleventh Amendment state sovereign immunity. See Ex parte Young, 209 U.S. 123 (1908). However, such relief is within the equitable power of the Court and I decline to order any such relief. It flies in the face of common sense. Partial summary judgment should be granted.

### d. Section 1981

The factual basis for Dr. Orr's § 1981 claim is similar to his First Amendment claim. He alleges that he was subjected to retaliation for opposing alleged racial discrimination and harassment directed at Dr. Hwang. 42 U.S.C. § 1981 prohibits employers from retaliating against employees for opposing racial discrimination. See CBOCS W., Inc. v. Humphries, 553 U.S. 442, 454–55 (2008); Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013). The test to show retaliation under § 1981 is the same as for the Leave Act and the First Amendment. Dr. Orr must establish: (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) the materially adverse action was causally connected to his protected activity. Wright, 730 F.3d at 737. Dr. Orr raises this claim against members of the South Dakota Board of Regents and President Schnoor in their official capacities as well as Dean Duncan in her individual capacity. Like Dr. Orr's First Amendment claims, to the extent

---

[6] "To trigger the Pickering balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships." Lindsay v. City of Orrick, 491 F.3d 892, 900 (8th Cir. 2007) (quoting Washington v. Normandy Fire Prot. Dist., 272 F.3d 522, 527 (8th Cir. 2001)). "Mere allegations the speech disrupted the workplace or affected morale, without evidentiary support, are insufficient." Id.

that Dr. Orr claims damages against the Board and President Schnoor, such claims are barred by the Eleventh Amendment.

At the outset, the defendants argue that this claim must be dismissed because the Eighth Circuit does not permit freestanding § 1981 claims. It is true that the Eighth Circuit requires a § 1981 claim to be brought pursuant to § 1983. See Onyiah v. St. Cloud State Univ., 5 F.4th 926, 929–30 (8th Cir. 2021). But Dr. Orr's complaint invokes § 1983 in his fourth cause of action by alleging that the defendants acted under color of state law and retaliated against him in violation of § 1981. See Doc. 23, First Am. Compl. ¶ 92. This argument of the defendants is without merit. Defendants also assert qualified immunity for this individual capacity claim against Dean Duncan. For reasons already stated relating Dr. Orr's other claims, defendants' motion for summary judgment with respect to Dr. Orr's §1981 claim against Dean Duncan should be denied.

Similar to his First Amendment claim, Dr. Orr also requests to be reinstated to his former teaching position based on a violation of § 1981. This claim against President Downs and the members of the South Dakota Board of Regents in their official capacities for equitable relief is not barred by Eleventh Amendment state sovereign immunity under the Ex parte Young doctrine. For the reasons stated earlier, I deny this relief and grant partial summary judgment.

## IV. Conclusion

Viewed in the light most favorable to Dr. Orr, it is entirely possible that the University may have treated him unfairly. The record shows that he was a well-respected educator, yet unfair treatment is not the same as violating federal employment and constitutional law. But, at this stage, defendants have not met the burden to grant their motion for summary judgment on all of Dr. Orr's claims. For the same reasons as stated above in relation to the defendants' motion for summary judgment, Dr. Orr has failed to meet the burden entitling him to judgment as a matter of law and his motion for partial summary judgment should be denied.

Now, therefore,

IT IS ORDERED, as follows:

23

1. Defendants' motion for summary judgment, Doc. 53, with respect to Dr. Orr's Family Medical Leave Act interference claim against the South Dakota Board of Regents is granted.

2. Defendants' motion for summary judgment, Doc. 53, with respect to Dr. Orr's Family Medical Leave Act retaliation claim against the South Dakota Board of Regents is denied.

3. Defendants' motion for summary judgment, Doc. 53, with respect to Dr. Orr's Title IX sex discrimination claim against the South Dakota Board of Regents is granted.

4. Dr. Orr's First Amendment retaliation claim against members of the South Dakota Board of Regents in their official capacities is dismissed.

5. Dr. Orr's First Amendment retaliation claim against President Schnoor in his official capacity is dismissed.

6. Defendants' motion for summary judgment, Doc. 53, with respect to Dr. Orr's First Amendment retaliation claim against Dean Duncan in her individual capacity is denied.

7. Dr. Orr's § 1981 claim against members of the South Dakota Board of Regents in their official capacities is dismissed.

8. Dr. Orr's § 1981 claims against President Schnoor in his official capacity is dismissed.

9. Defendants' motion for summary judgment, Doc. 53, with respect to Dr. Orr's § 1981 retaliation claim against Dean Duncan in her individual capacity is denied.

10. Dr. Orr's partial motion for summary judgment, Doc. 62, is denied.

11. Dr. Orr's request for oral argument on his motion for summary judgment, Doc. 90, is denied.

DATED this _11th_ day of May, 2023.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

24